UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN WERNIMONT,

    Plaintiff,

    CASE NO. 1:09-cv-768

v.

    HON. ROBERT HOLMES BELL

UNUM LIFE INSURANCE COMPANY
OF AMERICA,

    Defendant.
_____/

# **O P I N I O N**

Plaintiff Brian Wernimont has filed suit under the Employment Retirement Income Security Act of 1974 ("ERISA"), specifically 29 U.S.C. § 1132(a)(1)(B), to recover benefits denied him by Defendant Unum Life Insurance Company of America under the long term disability policy held by Plaintiff's previous employer. This matter is before the Court on the parties' cross motions for judgment on the administrative record.[1] (Dkt. Nos. 25, 28.) Because the Court finds that Defendant's denial of disability benefits was not arbitrary and capricious, Plaintiff's motion will be denied and Defendant's motion will be granted.

---

[1] Although Plaintiff's motion is styled as a motion for summary judgment, in ERISA cases, review is made on the administrative record, evidence is rarely taken, and therefore usual tests for summary judgment, such as whether genuine issues of material fact exist, ordinarily do not apply. *See Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609, 619 (6th Cir. 1998) ("[T]he concept of summary judgment is inapposite to the adjudication of an ERISA action.").

# I. Factual and Procedural Background

## A. Factual Background

On February 6, 2007, Plaintiff was injured in an automobile accident near his home in Rockford, Michigan.[2] (Dkt. No. 26, Def.'s Br., at 1.) Plaintiff had gone home to eat lunch. (UACL00226.)[3] On his way back to the office, he was driving south on Safety Drive when a semitrailer exited a private drive and, failing to yield, crossed Plaintiff's path in an apparent attempt to turn left (north) onto Safety Drive. (*Id.*; Dkt. No. 1, Ex. 1, Accident Report, at 2.) Plaintiff applied the brakes, but the roads were snowy and icy, and he slid into the truck. (Accident Report at 2.) Although Plaintiff was wearing a seatbelt, his vehicle slid partially underneath the truck, and Plaintiff was injured when the roof of his vehicle collapsed. (Dkt. No. 27, Pl.'s Br., at 2.)

Plaintiff's wife took him to the Emergency Room at Spectrum Health for treatment. (Def.'s Br. at 1.) In addition to a laceration to his hand, the Emergency Room report indicates that he reported or was diagnosed with a closed head injury, the symptoms of which included memory loss and dizziness. (UACL00522.) Plaintiff attempted to return

---

[2]There is some confusion in the record regarding the exact date of the accident. As noted here, Plaintiff identifies the date of then accident as February 6, 2007. This date is corroborated by the Kent County Sheriff's Office's accident report. (Dkt. No. 1, Ex. 1, Accident Report, at 1.) Defendant occasionally refers to the date of the accident as February 7. (UACL00770.) Fortunately, the exact date of the accident has no impact on the outcome of this case.

[3]Unum's administrative record for this case is some 780 pages in length, labeled UACL00001 - UACL00780.

to work the very next day, but was forced to return to the Emergency Room on February 8, 2007, due to ongoing problems with attention, headache, and nausea. (UACL00009.) On February 13, 2007, Plaintiff was diagnosed with post-concussion mild brain injury along with amnesia and increased difficulty concentrating. (UACL00569.) By this time, Plaintiff had returned to work full time. (UACL00225.)

Plaintiff had been employed as a tax accountant with Fiduciary Solutions, LLC, of which he was a co-founder and minority owner, since 2002.[4] (Dkt. No. 15, Am. Compl., at ¶ 69.) He was, by all accounts, a highly valued and well-compensated member of the LLC. Plaintiff estimates that while a typical accountant might process 250 tax returns in a year, his account load with Fiduciary Solutions was closer to 1500 to 2000 returns. (UACL00225.) Significantly, his compensation, which totaled in excess of $150,000 per year, included not only base salary, but also commissions, bonuses, and partnership income. (Pl.'s Br. at 3; Def.'s Br. at 1.) Plaintiff's relationship with Fiduciary Solutions, like that of other members and employees of the LLC, was governed by a one-year employment contract which ran from September 1 of one year to August 31 of the next year. (Pl.'s Br. at 3.) As is indicated by Plaintiff's long relationship with the LLC, renewals were typical. As an employee of Fiduciary Solutions, Plaintiff was covered by the long term disability insurance issued to Fiduciary Solutions by Defendant.

---

[4]Or possibly 1998. *Contrast* (Am. Compl. at ¶ 69) ("Brian Wernimont began working for Fiduciary Solutions in 2002."), *with* (Pl.'s Br. at 3) ("Plaintiff was a specialized CPA employed by Fiduciary Solutions, LLC[,] which he co-founded . . .") *and* (UACL00393 - an email from Plaintiff) ("[Citizens Bank] was signed as [Fiduciary Solutions'] second (and most profitable client) in late 1998 . . .").

Not long after the accident, Plaintiff began to report a number of neurological symptoms arising from the accident, primarily increased anxiety and depression. (Def.'s Br. at 1.) He reported being less organized, struggling to complete tasks, difficulty focusing, fear of failure, and frequent, severe headaches. (UACL00136; 450.) He met with numerous medical professionals in an attempt to alleviate these symptoms, and was in the process diagnosed with "Anxiety disorder secondary to concussive features and mild traumatic brain injury with panic obsessive compulsive features," "Generalized Anxiety Disorder existing prior to accident with post-accident exacerbation,"[5] "Personality traits and coping style affected from automobile accident," and "Pain Disorder associated with both psychological factors and a general medical condition/chronic." (UACL00463.)

It is not disputed that Plaintiff was impaired after the accident or that these impairments negatively impacted his job performance. (UACL00770.) His attending physician, Dr. Carrie Strong, noted that, "[a]nxiety negatively affects [Plaintiff's] organization and concentration," and Ronald Shoemaker, the managing partner of Fiduciary Solutions, noted that "the pace of his work / quantity of his work, for a substantial period of his contract term (and particularly after Feb. 2007) was significantly less than originally anticipated." (UACL00069, 271.) Plaintiff acknowledges in a June 3, 2008, email to Shoemaker that "during the 2007 tax season, my client service levels including return

---

[5]Plaintiff has some history of emotional problems dating back to 2004 and 2005. (Am. Compl. at ¶ 70.) However, Defendant has not argued that Plaintiff is barred from receiving benefits by a pre-existing condition, and this prior history does not appear to play a significant role in the present case.

4

production and turnaround times as well as customer contact and responsiveness, were not up to my usual standards." (UACL00338.) In that same email, Plaintiff suggested two job responsibilities at Fiduciary Solutions of which he could be relieved. (*Id.*) In response, Shoemaker stated that, "I don't believe that removing the two functions listed in your email will be enough," and added that he was in the process of interviewing candidates to make up for Plaintiff's decreased workload. (UACL00392.)

Nonetheless, Plaintiff was not immediately removed from his position at Fiduciary Solutions. Instead, on June 3, 2008, approximately 16 months after the accident, Shoemaker informed Plaintiff that his contract would be terminated at the end of the then-current term (August 31, 2008). (UACL00387.) Shoemaker went on to say that, "[i]n August, I intend to present you with a new Member Service Agreement reflecting a modification of your workload and your compensation. The workload will consist of a group of accounts that I am comfortable with you being able to service . . . ." (*Id.*) That is, Plaintiff would not be released from Fiduciary Solutions, but his workload and compensation would be decreased to levels commensurate with his new, reduced capacity. (UACL00393.) The new Member Service Agreement did indeed decrease Plaintiff's compensation. Comparison of the Plaintiff's 2007-08 compensation worksheet, as prepared by Mr. Shoemaker, with the proposed 2008-09 compensation worksheet reveals that Plaintiff's compensation would have fallen from $91,860 to $83,080. (UACL 00394-395.)

The new proposed Member Service Agreement also would have omitted "Attachment B," which had been attached to Plaintiff's Member Service Agreements since 1998.

5

(UACL00390.) Pursuant to Attachment B, Plaintiff was to receive 50% of Fiduciary Solutions' net income from Citizens Bank, a client that Plaintiff had brought into the LLC. (*Id.*) According to Plaintiff's calculations, these Citizens Bank payments represented $80,000 to $100,000 of annual income to him. (*Id.*) These payments were a commission for bringing in the client and thus were to be paid regardless of Plaintiff's employment status with Fiduciary Solutions. (*Id.*) Including this income in the calculation, Plaintiff estimates that the new Member Service Agreement would have decreased his income from $158,469.96 to $83,080. (UACL00393.) Without Attachment B, Plaintiff was unwilling to sign Shoemaker's proposed 2008-09 Member Service Agreement. (UACL00390.) Plaintiff informed Shoemaker of his decision on August 21, 2008. (*Id.*) Accordingly, Plaintiff's employment relationship with Fiduciary Solutions ended on August 31, 2008.

**B. Procedural Background**

On August 25, 2008, Plaintiff submitted a long term disability claim to Defendant pursuant to Group Insurance Policy No. 565240 002 (the "Policy").[6] (UACL0020-22; Def.'s Br. at 1.) According to the Policy,

> You are disabled when Unum determines that:
>
> -you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
> -you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.[7]

---

[6] The Policy is reproduced in the administrative record at UACL00185 - UACL00223.

[7] The boldfaced terms are given specific definitions elsewhere in the Policy.

(UACL00199) (emphasis in original). In his claim, Plaintiff stated that he could not "do [standard volume] of returns [or] concentrate for extended periods," that he had "[a]nxiety levels . . . leading to headaches,"and that he was suffering from "[h]igher [short term] memory loss." (UACL00020.) After an extensive investigation, Defendant denied Plaintiff's claim for benefits on December 18, 2008. In its rejection letter, Defendant informed Plaintiff that he was being denied benefits because he "did not sustain the necessary 20% loss in earnings required by the definition of disability," because he had not demonstrated that he suffered a loss of income due to sickness or injury, and because, in any case, any loss of income sufficiently great to satisfy the definition of "disability" occurred after his coverage ended. (UACL00340.) Defendant emphasized that any loss of income occurred because of a contract dispute with Fiduciary Solutions, and that, had Plaintiff not left Fiduciary Solutions, he still would not have qualified as disabled because the proposed compensation did not decrease by 20% as calculated by Defendant under the terms of the Policy. (*Id.*) Plaintiff, through counsel, requested review and appeal on June 12, 2009. (UACL00379.) On July 24, 2009, Defendant informed Plaintiff that it had found, after a review on appeal, that its original decision to deny Plaintiff's claim was appropriate. (UACL00768.) In its denial letter, Defendant noted that though it did "not dispute that [Plaintiff] was impaired after his February 7, 2007, automobile accident and that this impairment continued, [Defendant] also determined that [Plaintiff] did not have a 20% or more income loss to be eligible for benefits . . . ." (UACL00770.) Plaintiff was also informed of his right to dispute Defendant's determination through a civil suit under Section

7

502(a) of ERISA (29 U.S.C. § 1132). (UACL00772.) Plaintiff availed himself of this right on August 20, 2009. (Dkt. No. 1.)

## II. Legal Standard

"When reviewing an ERISA administrative decision, our review is limited to the evidence that the plan administrator examined in making his or her determination." *Ziegler v. HRB Mgmt.*, 182 F. App'x 405, 406 (6th Cir. 2006) (citing *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 441 (6th Cir. 2005)). Therefore, "the district court should conduct a . . . review based solely upon the administrative record." *Wilkins*, 150 F.3d at 619.

The standard of review on a denial of benefits decision in an ERISA case depends largely on whether "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "When such authority is granted, the highly deferential arbitrary and capricious standard of review is appropriate." *Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998) (internal quotations and citations omitted). Here, Plaintiff concedes that the Policy grants Defendant such discretion[8] and that the arbitrary and capricious standard thus applies. (Pl.'s Br. at 2; Def.'s Br. at 13.)

"The arbitrary or capricious standard is the least demanding form of judicial review

---

[8]According to the terms of the Policy, "[t]he Plan, acting through the Plan Administrator, delegates to Unum and its affiliate Unum Group discretionary authority to make benefit determinations under the Plan[.] . . . Benefit determinations include determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provisions of the Plan." (UACL00220.)

8

of administrative action." *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (quoting *Pokratz v. Jones Dairy Farm,* 771 F.2d 206, 209 (7th Cir. 1985)). Under this standard, "[t]he administrator's decision must be upheld if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005) (internal quotations and citations omitted). Furthermore, the Court "must accept a plan administrator's rational interpretation of a plan even in the face of an equally rational interpretation offered by the participants." *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005). Taken in conjunction with the limitation of this Court's review to the administrative record, the standard means that "[i]f the administrative record . . . can support a 'reasoned explanation' for Unum's decision, the decision is not arbitrary or capricious," and it will be upheld. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005).

### III. Discussion

Plaintiff argues that he satisfies the definition of "disability" given in the policy inasmuch as (1) he is limited from performing his material and substantial duties due to sickness or injury and (2) he has suffered a 20% or more loss to his indexed monthly earnings due to the sickness/injury. (Pl.'s Br. at 11.) Defendant disagrees and has offered three rationales for its decision to deny Plaintiff benefits under the Policy:

1. Plaintiff did not demonstrate on the record that he had suffered a 20% loss in indexed monthly earnings and would not have suffered such a loss if he had accepted the new Member Service agreement.

9

2. Plaintiff did not demonstrate that he suffered a 20% loss in indexed monthly earnings due to sickness or injury.

3. Plaintiff did not suffer a 20% loss in income until after his coverage under the Policy ended.

(Def.'s Br. at 14, 18, 21; UACL00340, 768-72.) Any one of these justifications, if upheld, would be an adequate and independent grounds to deny Plaintiff benefits under the Policy. Each will be examined in turn to determine if were applied arbitrarily or capriciously or if they are based on an irrational interpretation of the plan. *See Whitaker*, 404 F.3d at 949; *Gismondi*, 408 F.3d at 298.

**A.) Twenty percent decrease in monthly earnings**

Under most statutory schemes, as well as in common language, a person is recognized as "disabled" on the basis of a physical or mental impairment alone. *See, e.g.* 42 U.S.C. § 12102(1) (Disability defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual; . . . a record of such an impairment; or . . . being regarded as having such an impairment."). The Policy, however, defines a potential beneficiary as "disabled" only "when Unum determines that [*inter alia*]. . . you have a 20% or more loss in your indexed monthly earnings . . . ." (UACL00199) (emphasis omitted). In such cases as this, the plan's definition controls. *See Hansen v. Metro. Life Ins. Co.*, 192 F. App'x 319, 323 (6th Cir. 2006) (citing *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 294 n.4 (6th Cir. 2005)) ("In ERISA cases, disability is not a term of art but one that varies from plan to plan.") Monthly earnings is also a defined

term.[9]  "'Monthly Earnings' means your average monthly income as figured . . . from the income box on your W-2 form which reflects wages, tips, and other compensation from your Employer for the calendar year prior to your date of disability."[10]  (UACL00200.)

Plaintiff's W-2 income during the relevant time period is undisputed.  The record reflects the following W-2 income:

| Year | W-2 Income |
|------|------------|
| 2006 | $53.091.09 |
| 2007 | $59,656.35 |
| 2008 | $42,603.00[11] |

(Pl.'s Br. at 15; Dkt. No. 30, Def.'s Resp., at 3.)  Plaintiff argues that he became disabled in

---

[9] Both "indexed monthly earnings" and "monthly earnings" are defined terms, the former being defined with reference to the later.  (UACL00214-15; 199.)  However, the manner by which Defendant indexes monthly earnings does not play a role in this case, and thus, the Court will focus on the monthly earnings themselves, as the parties did in their briefs.

[10] Defendant acknowledges on several occasions that W-2 income may not be the best indicator of overall compensation, especially for such employees as Plaintiff, who earns a significant portion of his income from sources unreported on a W-2.  See (UACL00268 - an internal Unum report) ("The [employee] has a schedule K-1 as well as the W-2.  Did the [employer] intend for the Sch K-1 earnings to be included in the [monthly earnings]? If so, a contract change for a partnership that has W-2's and K-1's will be needed; this may require 2 [monthly earnings] definitions."); (Def.'s Br. at 2) ("[The Policy] was not intended to protect high income wage earners such as Mr. Wernimont from income loss resulting from a decrease in commissions, bonuses, or partnership income.").  Regardless, it is undisputed that the W-2 income is the relevant starting point and that Plaintiff's substantial partnership income is not considered.  See (Dkt. No. 29, Pl.'s Resp., at 2-3) (Acknowledging that non-W-2 income is "not part of the measurement stick of 'disability.'").

[11] Plaintiff cites this figure as $42,603.46, perhaps because Plaintiff has access to his actual W-2, while the administrative record includes only his W-2 income as reported on his 2008 Form 1040, which rounds to the nearest dollar.  (Pl.'s Br. at 15.)

2008. In arguing that he meets the 20% loss in monthly earnings requirement, Plaintiff first argues that the drop in W-2 income from $59,656.35 in 2007 to $42,603.00 in 2008 alone (a drop of 29%) clearly establishes the requisite decrease in monthly earnings. (Pl.'s Br. at 15.) Plaintiff is incorrect. According to the Policy, the relevant factor is not Plaintiff's W-2 income itself, but rather his *monthly earnings* "as figured . . . from the income box on [his] W-2 form . . . ." (UACL00199-200.) Thus, Plaintiff's W-2 income, a reflection of total income for the year, must be used as a basis by which to calculate monthly earnings, and only then can a determination be made as to whether Plaintiff should have been found to satisfy this prong of the Policy's definition of disabled.

Plaintiff, apparently conceding this point, also argues that monthly earnings should be figured by taking the W-2 income and dividing by twelve, the number of months in the year. (Pl.'s Br. at 16.) Thus, Plaintiff's 2007 monthly earnings would be $4,971.36 ($59,656.35 / 12), and his 2008 monthly earnings would be $3,550.25 ($42,603.00 / 12). This is not, however, how Defendant calculates monthly earnings. *See* (UACL00267; 348). Rather than dividing by twelve in every case, the record is clear that Defendant calculates monthly earnings by dividing W-2 income by the total number of months that the claimant actually worked. In the instant case, Plaintiff worked twelve months in 2007, for monthly earnings of $4,971.36 ($59,656.35 / 12), but only eight months (January - August) in 2008, for monthly earnings of $5,325.38 ($42,603.00 / 8). Thus, by this method, Plaintiff's monthly earnings for the first eight months of 2008 actually saw an increase over his 2007 monthly earnings, not the 20% decrease required to receive benefits under the Policy.

Plaintiff argues that Defendant's "interpretation that the average monthly wage should be determined on an eight month basis for 2008 instead of a twelve month basis is completely arbitrary" because there is nothing in the Policy to require this interpretation. (Dkt. No. 34, Pl.'s Reply, at 1) (emphasis and exclamation omitted). This apparent reference to the arbitrary and capricious standard employed by this Court is misplaced. The Court does not merely defer to the written terms of the Policy itself, but also to the "administrator's rational interpretation of a plan." *Gismondi*, 408 F.3d at 298.[12] Here, even under a more demanding standard of review, the Court would find that it is altogether rational and reasonable to interpret "monthly earnings" as the income a claimant earns from a month of work. This is apparently an interpretation that Defendant employs uniformly and consistently. In fact, "[n]umber of months in the W-2 year" is marked as a "mandatory entry" on Defendant's monthly earnings calculation worksheet. *See* (UACL00267; 348). On that basis, the Court finds that it was not arbitrary and capricious for Defendant to find that Plaintiff's monthly earnings for the coverage period in 2008 (through August 31) did not decrease by 20% or more relative to previous monthly earnings.

Furthermore, using this method of calculation, it does not appear that Plaintiff's monthly earnings would have dropped by the requisite 20% under Fiduciary Solutions' proposed Member Service Agreement. Under the new agreement, Plaintiff would have been entitled to total compensation for the year of $83,080. (UACL00395.) This compares to a

---

[12]Plaintiff also argues that "[a]ny ambiguity is construed against the insurer." (Pl.'s Br. at 15 n.5.) As noted herein, that is incorrect.

total compensation, exclusive of some bonuses not included in monthly earnings, of $91,860 for the previous period. (UACL00394.) While it is not clear how directly either of these numbers would translate into actual monthly earnings (as calculated by dividing W-2 income by months worked), the Court finds that the decrease would have been less than the requisite 20%. Plaintiff argues strenuously that his compensation including bonuses, commissions, and partnership income would have decreased by more than 20% under the proposed Membership Service Agreement. This fact, true though it may be, is altogether inapposite for calculating a decrease in monthly earnings. In his August 21, 2008, letter to Mr. Shoemaker, Plaintiff notes that the proposed Member Service Agreement "would, in effect, reduce my total compensation from FS for next year by approximately 50%." (UACL00390.) He also notes, though, that the vast majority of this decrease would be due to the elimination of Attachment B, which entitled Plaintiff to a substantial bonus. (*Id.*); *see also* (UACL00393) ("The bonuses this addendum entitled me to and I had had myself paid on a monthly and annual basis (with Mr. Shoemaker's approval) had accounted for over 1/2 of my compensation since 1999."). This income would not have been reflected in his W-2, and thus does not figure into a calculation of monthly earnings under the Policy. Regardless of its inapplicability, Plaintiff considers this in each of his calculations of total income. *See* (UACL00390, 393; Pl.'s Resp. at 2, 4 n.2). In short, the figures of $91,860 and $83,080 are apparently the closest numbers available to the Court in estimating how the proposed Member Service Agreement would have affected Plaintiff's monthly earnings under the plan, and these figures indicate a decrease of less than 10%. Thus, the Court concludes, as

did Defendant, that Plaintiff's monthly earnings would have decreased by less than 20% had he accepted the proposed Member Service Agreement.[13]  *See* (UACL00340) ("[H]ad you executed your new contract and continued working, you would not have incurred the necessary loss of earnings to satisfy the definition of disability."); *and* (UACL00771) ("[H]ad your client continued to work beyond September 1, 2008 he would not have had a 20% or more loss of income.").

**B. Due to the same sickness or injury**

Not only does the Policy require that a claimant have a 20% or more loss in monthly earnings, it also requires that this loss be "due to the same sickness or injury" which limited him from performing the material and substantial duties of his regular occupation. (UACL00199.)  Here, the parties agree that Plaintiff was limited by sickness or injury but disagree as to whether any loss in income was due to this limitation.  Plaintiff argues that he

---

[13] In Pl.'s Resp. at 4 n.2, Plaintiff argues that the two numbers do not represent an "apples to apples" comparison. Plaintiff argues that the 2007-08 number ($91,860) does not include the $48,000 of Comerica Bank work, while the 2008-09 number ($83,080) contemplates $7,500 for the Comerica Bank work. By reference, it appears to the Court that Plaintiff is referring to his *Citizen's* Bank work (the 2007-08 worksheet refers exclusively to Comerica Bank work, while the 2008-09 worksheet refers primarily to Comerica Bank work with $7,500 for Citizen's Bank work).

As noted, much of Plaintiff's compensation for his Citizen's Bank work came largely in the form of bonuses which are not reported on his W-2. As Plaintiff points out in a June 12, 2009, email to his counsel, he can locate on the worksheets an "apples to apples" comparison by looking exclusively at the Comerica Bank income, which shows a net reduction $16,280. (UACL00393.)  This represents a 17.7% decrease in income.  His further calculations show that any further decrease in total income is due to the elimination of K-1 income and its replacement with W-2 income. (*Id.*)  This modification would actually increase his monthly earnings as calculated under the Policy, and would result in the figures listed herein – $91,860 and $83,080.

did sustain loss due to sickness or injury, and asks the Court to overturn Defendant's determination that any loss in monthly earnings he sustained was due to Plaintiff's contract dispute with Fiduciary Solutions.

As noted above, Plaintiff did not sustain the requisite 20% loss in monthly earnings prior to September 1, 2008, and he would not have sustained such a loss had he accepted the proposed Member Service Agreement. Thus, the only manner by which Plaintiff can show the requisite 20% loss in monthly earnings due to sickness or injury is by showing that his employment relationship with Fiduciary Solutions was terminated due to that sickness or injury. The most direct route for such an argument – that Plaintiff elected not to sign the new proposed Member Service Agreement because of his sickness or injury – has been foreclosed by Plaintiff's own arguments: "i[t] was never being claimed that Mr. Wernimont's actions regarding the contract renewal were caused by psychiatric problems." (Pl.'s Resp. at 5.)

Rather, Plaintiff's argument is more circuitous: "[f]irst, *but for* Wernimont's disability, his continuing contract would not have been terminated in the first place *and but for* Wernimont's disability, he would not have been presented with the lower wage contract." (Pl.'s Br. at 3) (emphasis in original). Thus, Plaintiff argues, and all parties agree, that his capacity to work was diminished due to an auto accident. Because of that diminished capacity, his workload was decreased, and under a proposed new contract, he faced a decrease in compensation as well. The compensation decrease was significant, and

16

on that basis, Plaintiff elected not to renew his contract. This resulted, of course, in Plaintiff's loss of employment and, in turn, the utter elimination of his employment income.

In other words, Plaintiff's compensation decreased drastically because he chose not to renew his contract, he chose not to renew his contract because his compensation would have decreased by a lesser amount, his compensation would have decreased by that lesser amount because his capacity had decreased, and his capacity had decreased due to a sickness or injury.

Under a strict, sequential analysis of but for causation, Plaintiff's argument would be compelling. But this is not a law school hypothetical, and this Court is not in the practice of stretching lines of causation beyond the intervening acts of third parties, much less the intervening acts of a party seeking relief. Here, Plaintiff elected to discontinue his employment with Fiduciary Solutions. That election was not caused by sickness or injury, and it was that election alone which led to the 20% decrease in his monthly earnings. This comports with the findings of Defendant, *see* (UACL00340) ("You ceased working due to a contract dispute with your employer."),[14] and for that reason, the Court will not overturn Defendant's determinations as arbitrary and capricious.

---

[14] Plaintiff argues that these determinations by the Defendant are not evidence and that they are thus irrelevant. (Pl.'s Resp. at 5.) That too is incorrect. Far from being irrelevant, these determinations are binding unless they are found by the Court to be arbitrary and capricious.

**C. Income loss after the coverage period**

Defendant also determined that any loss in monthly earnings incurred by Plaintiff occurred after his coverage under the Policy ended:

> Your date of disability cannot pre-date September 2, 2008 because you did not sustain the necessary 20% loss in earnings required by the definition of disability. On September 2, 2008, you were no longer covered under the plan. Any disability after coverage terminates is not covered.

(UACL00340); *see also* (UACL00771) ("[Plaintiff's] employment was terminated as of August 31, 2008 and your client's coverage ended as of that date. Any period of disability commencing after that date would not be covered under the policy.")

Under the Policy:

> Your coverage under the policy or a plan ends on . . . the last day you are in active employment except as provided under the covered layoff or leave of absence provisions. Unum will provide coverage for a payable claim which occurs while you are covered under the policy or plan.

(UACL00197.)

Because Plaintiff declined to sign a new Member Service Agreement, his last day of active employment was August 31, 2008, and his coverage ended on that date. (Pl.'s Br. at 5.) Because he had no loss of earnings before that date, he was not disabled as defined by the Policy. Because he was not disabled, he had no payable claim which occurred while he was covered under the Policy, and Defendant determined that Plaintiff is not entitled to benefits.

18

Plaintiff now argues that this determination should be overturned because the Policy's definition of coverage period is ambiguous and Defendant's application of that definition is arbitrary. (Pl.'s Resp. at 6.) Plaintiff argues that "[u]nder Unum's interpretation of its policy[,] no one who was terminated because of a disability could ever receive benefits." (Pl.'s Reply at 2.)

The Court finds no ambiguity in the Policy and does not find Defendant's application of that policy to be arbitrary. The terms are clear, and under those terms, Plaintiff suffered a 20% loss in earnings and became disabled, if at all, after his coverage ended.[15] To the extent that Plaintiff is challenging the terms of the Policy itself, it is unclear what type of relief Plaintiff requests. As noted by another court faced with similar circumstances, "Plaintiff does not ask the Court to strike the policy language or find it unconscionable. The Court's task in an ERISA case is to review the administrative record and determine if the administrator's decision was unreasonable." *McKay v. Reliance Std. Life Ins. Co.*, No. 1:06-cv-267, 2007 U.S. Dist. LEXIS 73372, at *20-21 (E.D. Tenn. Sept. 28, 2007). Here, the Court has reviewed in detail the lengthy administrative record and has determined that Defendant's decision was eminently reasonable.

## IV. Conclusion

---

[15] As indicated in the previous section, it is unlikely that Plaintiff would have been found by Defendant or this Court to be disabled even if his coverage had not ended.

For the foregoing reasons, this Court finds that Defendant's determination that Plaintiff was not entitled to long term disability benefits under the Policy was well supported by the administrative record and was not arbitrary and capricious. Accordingly, Plaintiff's motion will be denied, and Defendant's motion will be granted. An order and a judgment consistent with this opinion will be entered.


Dated: December 3, 2010  /s/ Robert Holmes Bell
ROBERT HOLMES BELL
UNITED STATES DISTRICT JUDGE